and others. Looks like Mr. Rhoades gets to go first. Good afternoon, Your Honors. And may it please the Court, I'm Carroll Rhoades and I represent the appellant in this case, Mr. DeSanto Rollins. And this case is an appeal from the United District Court for the Northern District of Mississippi, where the district judge dismissed all of Mr. Rollins' federal and state law claims on a motion to dismiss that was converted to a motion for summary judgment because matters outside the pleadings were considered. And Mr. Rollins asserted three claims against Mr. Kiffin in his individual capacity. Mr. Kiffin is also the head coach for the University of Mississippi. The University of Mississippi is a state-owned and operated institution of higher learning. Mr. Rollins asserted a violation of the Equal Protection Clause on account of race and on account of sex. And he also stated a state law claim of intentional infliction of emotional distress. And he also stated six claims against the university itself, Title VI, Title IX, Section 504 of the Rehabilitation Act, and the American with Disabilities Act. He also stated two state law claims, negligence and gross negligence. The district court dismissed the 504 Rehabilitation Act claim and the negligence claim without prejudice and dismissed the remaining claims with prejudice. Those are the claims that are pending before the court on appeal. In his complaint, Mr. Kiffin stated damages. The damages he sought were for physical pain, emotional distress, embarrassment, and humiliation, medical bills, court calls, and attorney's fees. He also sought injunctive relief of being reinstated to the... How did it cost, what happened, how did that cause physical pain? Your Honor, he had not just headaches, but he was also suffering from physical injuries that he said he could not perform his regular life, daily life activities. And because of the emotional distress that he was under, that caused him more pain even in trying to perform the regular daily life activities. And I submit, Your Honor, that more than likely his main element of damages are the emotional distress damages. And that's the one where the district court addressed on all of his federal claims against the university as well as against Mr. Kiffin. Mr. Rhodes, let me ask you, on the motion to dismiss on the ADA claim, defense points out that perhaps your briefing on appeal didn't deal with the motion to dismiss that you sort of dealt with everything as a summary judgment. If you agree with that, isn't it true then you really haven't briefed why there was any error in dismissing the ADA claim? As opposed to summary judgment on that claim? As opposed to summary judgment. Your Honor, Mr. Rhodes did allege facts that would support the ADA. Well, I'm talking not facts, I'm talking about words. The pleading, was the complaint sufficient to make a cause of action for the ADA claim? And before he got to summary judgment, Judge Mills dismissed that claim as my understanding, correct me, but dealt with it on a motion to dismiss and did not transform that into a rule of six. So what we're dealing with on the ADA claim is just strictly was your pleading, and you tell me if I'm wrong, was your pleading sufficient to make that claim? Yes, Your Honor, based on notice pleading, we submit that that pleading was sufficient to make an ADA claim. And the district court dismissed it primarily saying that Mr. Rhodes was not qualified for the position. The district judge based that upon Mr. Rhodes not being able to return to the team because they said he had to have an excuse from his physician that he was able to return to the team. Mr. Rhodes alleged that . . . Why isn't that something they would want to know? Because you wouldn't want somebody to get hurt because they came running back onto the team when they shouldn't have been there, right? But the question is if you're physically able to do what you're required to do. And he says that to be on the team is more than just contact sports. He said there are other things that he did on the team. Go to team meetings, participate in community activities, senior day activities. There are a lot of other things that he did on the team that would not have required him to actually play a contact sport. And what's the law that says he has the right to be on the team? Your Honor, he has a right not to be discriminated against because of a disability or because of his race or sex. And what he's alleged in . . . But I mean, let's give a hypo if he broke his leg and they said, well, we won't let you be on the team. How would that be discrimination for his disability? You need a leg to do football, to my knowledge. Not that I'm an expert on football, but . . . And get to Judge Southwick's question, too. As to the disability, when it set in, Mr. Rollins said he was qualified to be on the team when Lane Kiffin kicked him off on March 21st. He had not taken . . . gone to the doctor except he had gone to the doctor on March 1st, the team doctor. But he had not gone to his own psychologist. He was able to attend and do everything else except for being kicked off the team. And for a physical disability, if you break your leg, there were white players, he alleged, that did suffer physical injuries, but they were not kicked off the team. We're not saying he has a right to be on the team. He has a right not to be treated differently from either white or female players. Okay. I had understood that, you know, they had this terrible conversation where Kiffin was a bit of a jerk, but then he was let back on, like right after that. I mean, in other words, he was taken off and then put back on within minutes or hours, not years. So why . . . I mean, but they wouldn't let him actually play unless he got the medical information, which again, I'm just having a little . . . I'm just trying to struggle to understand really what happened. You know, when I was a state district judge, I would interact more with what really happened. Here, it's a little bit harder. So please explain. Your Honor, what happened, and this is akin to an assault, an assault and battery. If Lane Kiffin had taken a gun and shot Mr. Rodman, the injury would have been done at the minute that bullet hit him, right at the end of that day. Then Mr. Kiffin could have gone and tried to stop the bleeding, called for medical help, and then said, I did not mean to shoot you. The injury was done at the time the bullet was fired. Same way, the injury being done to Mr. Rollins on March 21st and February 27th. He had an initial meeting with Mr. Kiffin on February 27th, and in that meeting, Mr. Rollins said that Coach Kiffin abused him, was abusive toward him, and Mr. Rollins said he did not feel in a good place. He needed to take a mental health break. He was not given a mental health break then. He did go and call his mother and coach after he left that meeting, and his coach did get him to be the team psychologist later on. But he still would have been able to participate in all the other team activities other than playing. The record reflects that he was kicked off the team during a conversation that occurred on March 21st. Does the record reflect that he was ever put back on the team? Where does the record reflect that he was put back? There are some email messages where once Mr. Rollins left that meeting with Coach Kiffin on March 21st, that Coach Kiffin sent text messages saying that he's back on, he's on the team, he's not off the team. But the damage was done emotionally and mentally at the moment that Coach Kiffin told him he was off the team because he was already suffering from emotional trauma prior to that day. Just so I'm clear on the record, does the record say he was put back on the team or does the record say something to the nature of his scholarship hasn't changed? The record says that Mr. Kiffin sent him a text, you're not off the team. That was after he verbally told him that you are off the team. And for emotional stress damages, those damages were done the minute that... I guess I'm just a little bit, to me it's a little different getting shot because you can't undo that very easily. But if someone told me, hey, we're going to take you off the fifth circuit and I'm like about to start crying and then they go, oh sorry, we'll put you back on. I don't know why that would mean that I'm forever in pain and horror and terror when I would be thrilled that, oh my gosh, okay, whew, wow. If it was close in time, now if I was taken off and then put back on, whatever, that would be maybe different. But I'm just saying, to me, I understand the notion of if somebody shot you, that's kind of hard to just, ah, I'm sorry, I didn't mean to shoot you. That's a little different from, oh, please walk out of here now. And then as you're starting to walk out, oh, I'm sorry, come back. And you still get to make your argument. Not if you're already suffering emotionally hard. But wouldn't you be thrilled that you were taken off and put right back on? Oh my gosh, wouldn't it go from, ah, to ah? Not if the person who's putting you back on is the same person who called you emotional harm a month earlier. Mr. Rollins met with his defensive line coach on November 28, 2022. And the reason he met with him, because Coach Tiffin was trying to get Mr. Rollins to get into the transfer portal. Mr. Rollins did not want to get into the transfer portal then. And when he met with his, ah, Coach Joyner, Coach Joyner said he was going to bring in someone else who was going to play over him. Mr. Rollins had physical injuries that he was suffering prior to that time. As a matter of fact, he was still suffering an LCL re-injury that he had had two years earlier. He was still under a doctor's care. He was still suffering that physical injury when he met with Coach Joyner on the right to force him into the transfer portal. Mr. Rollins told Coach Joyner he wanted to stay at the University of Mississippi. He wanted to graduate. And then, starting in February, the coaching staff kept calling Mr. Rollins saying that Coach Tiffin wanted to meet with him. On February 27, 2023, Coach Joyner told Mr. Rollins that Mr. Tiffin wanted to meet with him. He met with him. And during that meeting, Coach Tiffin yelled at him, screamed at him, talked to him in the hospital. Now, this was a month before the March 21st meeting when he actually kicked him off. And during that meeting, Mr. Rollins told Mr. Tiffin that he wasn't feeling good, he was suffering from emotional distress, and he needed to take a mental health break. And Coach Tiffin did not give him a mental health break then. Mr. Rollins left that meeting and went and called his mother and another coach. They got him a mental health treatment. One of the folks doing the mental health treatment was Dr. Nicholson, who was the assistant athletic director. And she, as well as the coaching staff, said, Coach Tiffin wants to meet with you again. Mr. Rollins still did not want to meet because he was already suffering emotionally and mentally. And he finally gave in and met with Coach Tiffin on March 21st. So the actual harm started February 27, but when he kicked him off the team on March 21st, from that point on, Mr. Rollins had a tough time interacting with Coach Tiffin, except he still wanted to participate in all the other team activities that he had been invited to participate in, was allowed to participate in, prior to being kicked off the team. Since he was kicked off the team, no one else was allowed to participate in it. White football players who had had injuries and had taken breaks were still allowed to participate in those activities. Even female athletes were allowed to participate in their activities. Was Coach Tiffin the coach of the female athletes as well? No, ma'am. It's just the University of Mississippi under those civil rights statutes. Well, your comparators are an issue, but you only have 15 seconds. I want to ask you about them. You may want to be alert to that on your rebuttal, just how comparable are your comparators. Thank you for your argument, Mr. Rose. Good afternoon, Your Honors. I please the Court. I'm Paul Watkins, here for the affiliates today. I'm going to address primarily Mr. Rollins' claims of discrimination. If the Court has questions about the state law intentional infliction claim, my colleague, Mr. McGuffey, can tackle those questions. What's your best evidence that this was not racial or sexual discrimination? The best indicator that there was no unlawful race or sex discrimination, Your Honor, is that there's no proof of discriminatory intent. As the District Court pointed out in its order, it cast doubt on the likelihood that the comparators were in fact similarly situated to Mr. Rollins, but it specifically held that there was not even any argument presented to the District Court that Mr. Kiffin acted with discriminatory intent. There was no proof of derogatory terms related to race, sex, or disability. I understand that part, but some people discriminate without saying in so many words that that's what they're doing, and so that can still be a problem. And your opponent says the problem is other people who were white or female were allowed to do XYZ that Rollins was not. Yes, Your Honor, and the only proof related to those comparators in the record is four lines in Mr. Rollins' declaration that he submitted in response to the motion to dismiss where he identifies two white football players and a couple of other female student-athletes at the university. The female student-athletes, to go to your question, Judge Douglas, there is no proof that they were on the football team, that they were coached by Coach Kiffin, that he had any knowledge or information about what was going on with them. The situations of the white football— One of the universities, which is still a defendant, correct? The university is not—the equal protection claims are not against the university. The Title VI and Title IX discrimination claims are against the university, Your Honor. Okay, so how do we work with that? Coach Kiffin had no role to play with these female athletes, but the university did, and university management took no effort, took no steps to address whatever was going on. I'm not saying anything other than respond to that. Sure, Your Honor. So there's no proof in the record that there was a policy in place at the university regarding—well, let me back up and talk about what the proof actually shows, because what the proof shows is a little different than what the arguments before this court now are. Again, the only proof about those female student-athletes were two lines out of Mr. Ryland's declaration that was submitted in response to the motion to dismiss, and it said that there were female softball players and female volleyball players that were not kicked off their respective teams after they requested a mental health break. You used players for both. I thought there were two women. Is there more than two women involved? Multiple players? I think it is plural for both of them. I'm not sure exactly how many it is without looking back at the declaration, Your Honor. But number one, Mr. Ryland's was not kicked off the university's football team. So it's not an argument— I heard Mr. Rosen, you heard it too, concede that one of these texts actually said you're back on the team. I was sort of where Judge Douglas was implying she might have been. Then I thought Coach Kiffin had made it clear that you'll still have scholarship, you'll still go to class, you're not going to be, you know, suffer those sorts of consequences. Did the coach ever say you're back on the team in some specific wording? Sure, Your Honor, and let me address that, because the case is before the court in a weird sort of procedural posture, but it's important to take a minute to look at that Do you blame Mike Mills for any of this? Absolutely not, Your Honor. I want to say that as loud as I possibly can. Okay, keep going. So when the plaintiff, Mr. Ryland's first filed his lawsuit, his core factual allegation was that he'd been kicked off the football team, particularly for these discrimination claims. This was the adverse act, this was the deprivation of my constitutional rights, I was kicked off the football team, and this was disparate treatment. When the defendants filed their motion to dismiss, they pointed out to the district court that they cited to the university's football website that said he's still on the roster. We didn't supplement the record. We asked the district court to take judicial notice of that publicly available government-sponsored website. In response, Mr. Ryland submitted his declaration, 12 pages of assertions about what happened around the time of the incidents in question here. So the defendants in rebuttal took the opportunity to further supplement the record with texts and email communications between Coach Kiffin on the one hand, Mr. Ryland's on the other hand, showing the communications between them what was actually said. Mr. Ryland doesn't dispute the authenticity of these emails. He didn't move to strike them. He didn't ask the district court to disregard them. He said in his motion to dismiss response that it was possible the court could consider this under Rule 56. So after the defendants supplemented the record, Mr. Ryland again further supplemented the record, moved to supplement the record with about 45 pages of additional text messages and communications that the court eventually considered in ruling on what it converted to a motion for summary judgment. Judge Southwick, to your question earlier, the court, the district court converted the entire matter. It considered all of the claims on this. You would not say the ADA claim was dealt with on the pleadings separate from the record? No, Your Honor. In ruling on the qualification question, the district court specifically looked at the supplemental information that was in the record. So he considered that under Rule 56. So the information that was before the district court at the time, what the record showed is that after the March 21st meeting, which was the allegation that I was kicked off the team on March 21st, within 15 minutes after the start of that meeting, Coach Kiffin texts Mr. Ryland and says, you have not lost your scholarship in any way. I'm trying to understand your plan for what you were doing. There's no response to that text. The record further reflects three days later, Coach Kiffin texts him again and says, take as long as you want or need to do whatever you need to do. We will support whatever you need to do. In response to that text message, Mr. Ryland texts Coach Kiffin back and says, I'm sorry, I can't communicate with you directly anymore, and gives his attorneys contact information. On March 28th, Coach Kiffin sits down and writes an email to Mr. Ryland that says, I just want to be clear, your scholarship status has not changed. You still have access to academic, health, psychological supports like other student-athletes do. We want to support you. We want you to focus on your well-being. When you are ready to return to the team, please contact the football sports psychologist at this email address at this number. When you're ready. The next day, the response to that was Mr. Ryland's attorney sent a letter to Coach Kiffin directing him and the rest of the university's athletic staff to not have any further direct contact with Mr. Ryland. So that's the record that the district court had in front of it at the time. Not just there was an email sent after this contentious meeting in which the coach said, I want to talk to you again. He reached out repeatedly to him saying, okay, you said you want to take some time. Take some time. Here's what to do when you want to come back. And the response was. This particular narrow point is, but what you quoted from the texts and emails, which I think would be the most, you would have identified the most important ones, never quite say you're still on the team. The fact that he still has a scholarship, I don't know enough about the scholarships at Ole Miss or any other place else, maybe that means in and of itself that he's still on the team. But it does seem to me, did Judge Mills remind me, did he actually find that he was back on the team? Judge, the district court's specific ruling was that the plaintiff, Mr. Ryland, could have returned to the team any time he wanted had he submitted the appropriate medical clearance as the university required. That was the, I think that came specifically in the ruling on the ADA claim, Your Honor. He said that you can't show that you're otherwise qualified if you're not complying with this requirement of medical. Wasn't the scholarship for being on the team? It was a football scholarship, yes, Your Honor. That's correct. So while he couldn't go play a football game without the medical, he was still on the team by virtue of having the scholarship. As far as the record reflects, Your Honor, yes. And in fact, when Mr. Ryland says in his declaration that was submitted in response to the motion to dismiss and what counsel said, that he was not invited to participate in other team events, the university was specifically directed not to have any direct communication with him. That was Mr. Ryland's choice to stop after that. The record further reflects that after Coach Kiffin had been reprimanded for contacting him directly, later in August, correct, well, first by the plaintiff himself who said, I can't speak with you. And then several days later with the letter from his counsel, yes, Your Honor. The reprimand all of a sudden sounded like the university had done something. You're not saying that. No, Your Honor. He had been asked not to contact him directly. That's a more appropriate word. But in early August of last year, before the start of the fall 23 academic semester and before the start of the football season, an attorney for the university, Ms. Debra, and these messages are in the record as well, reached out to Mr. Ryland's counsel. That was what he had asked, don't contact him directly. And said, we need to have a conversation about what needs to happen to allow him to transition back to team activities. And let's not forget the reason that he wasn't participating in team activities, that was an allegation of the complaint too. He said he needed to be away from the team on a mental health break. And so... He was taking himself off the team. That's what the allegation was, Your Honor, is that he informed the university in February that he wanted to take a mental health break. So between February... That assumes that a mental health break is the equivalent of asking to be taken off the team, right? In the abstract, I think that's correct, Your Honor. I think based on my understanding of the limited record that we have before us, the mental health break meant that he was not there participating in team activities. Tell me if I'm missing something in the timeline. On March 21st, he was told that he was kicked off the team. It was August, which I think is about five months later when he was told in order to return back to team activities, you will need some sort of a medical note or clearance or what have you. What is the appropriate time for us to look at if we were doing a disparate treatment analysis? Will we be looking at the March 21st or do we have to take into account what happened in August, which was five months later? In terms of determining when some kind of adverse position was taken, Your Honor, is that... Is the sole thing we're looking at is whether or not there was disparate treatment in the fact that he was kicked off the team on March 21st or is the fact that he was told that he could only return to the team with the medical note a part of that analysis as well? Let me start back in March. I think this is responsive to your question. Within 15 minutes of the meeting on March 21st, he's told, not in so many words, not you are no longer kicked off the team, but he's told your scholarship is in place. I need to talk to you to understand what your plan is. And he was contacted twice over the next several days saying, we want you to take care of yourself. When you are ready to return, you can. This is the person you need to talk to. So the record is clear that the door was open for him to come back when he was ready to. Now, the requirement of a medical release, that did come up in the August email. It's sort of a red herring here, Your Honor, because Mr. Rollins has never argued before his appeal to this court that the requirement of a medical release was the adverse action itself. Adverse action is whatever happened in March. That's correct. What his complaint said was that I was kicked off the team. What his declaration said was that I was kicked off the team and then I was not invited to participate in certain team activities. The district court, when it ruled that he couldn't show he was otherwise qualified under the ADA Title II analysis, specifically said the decision to come back was his. All he had to do was provide medical clearance and he has made no argument that he was singled out or that he was treated differently than any other student athlete with that requirement. And the district court went on to note that, in fact, his declaration stated that when he had been injured two other times previously, his own testimony was that he had to be medically cleared in some way. So a requirement of medical clearance wouldn't have been a surprise to him. But I think the most salient point there, Your Honor, is that we are looking at what happened in March because the plaintiff himself, Mr. Rollins himself, never alleged until after his claims had been dismissed that the medical clearance requirement was somehow discriminatory or constituted pretext in and of itself. All right, counsel. You've got 32 seconds. You going to use them? Yes, Your Honor. Briefly, you mentioned the comparator issue and we talked briefly about the female student athletes. The other student athletes were also not comparators in no small part because the proof in the declaration says they were not kicked off the team. Well, that doesn't indicate disparate treatment if Mr. Rollins wasn't kicked off the team. And there's also no proof in the record that the circumstances under which those student athletes were temporarily away from the team were similar to Mr. Rollins. Thank you, Your Honor. All right, counsel. Please support Mitch McCuffie on behalf of Plain and Kiffin in his individual capacity. I'm actually going to address two, both of the claims or the claims that have been outlined against him individually. I'll be brief on the individual protection claim because we've had some discussion of the merits of that claim already. I do want to start with one point that was sort of challenged in the briefing as to what the correct standard of review or what we need to be looking for here. Coach Kiffin is operating in a discretionary position as an employee of the state. He put forward a defense of non-immunity, and it is the plaintiff's burden to overcome that defense by showing a violation of a clearly defined constitutional right. Therefore, you go look at the equal protection claim and the elements of an equal protection claim, and that's what Judge Mills did. The plaintiffs and the appellate here has now argued that we need to apply the McDonnell-Douglas framework, which is really an employment law, Title VII type of field, which I know has implications for the university, but not necessarily for Coach Kiffin individually. It's largely a distinction without a difference except for one point, and it's a point that Judge Mills made in his opinion, that there was no evidence of discriminatory intent, which is a requirement to make an equal protection claim. That's not a requirement under the McDonnell-Douglas framework, not explicitly. And I don't think there's any dispute on that point. There was no evidence put forward of discriminatory intent on behalf of Coach Kiffin. Looking specifically at the equal protection claim under whether we're talking about McDonnell-Douglas and adverse actions and whether or not you were treated worse than similarly situated comparators or whether we're looking at differential treatment of a similarly situated comparator under equal protection, I do want to clarify a couple of points on the timeline as it relates to Coach Kiffin. And again, just reiterating that that equal protection claim is against him only. It's not a university-specific claim. The timeline as it relates to those two is that they met in February 27th. The complaint acknowledges then that following that meeting that Mr. Rollins went and was assigned both a university psychologist to consult with and then followed up and said that he was consulting with his own therapist and that he was not participating in team activities in that interim period. Then Coach Kiffin, two days later, says, hey, I want to meet with you again. He relays that message over and over and the complaint actually acknowledges and the text messages confirm that Coach Kiffin had made that request. Let me skip forward just to, I'm just going to cut that off. I do want to touch on this comparator question. The white football players, I'm going to leave aside the female athletes. The white football players are not comparators for a number of reasons. Council indicated that they were physically injured. That's not correct. The two comparators that were identified, one was serving NCAA suspension. That's why he was on a break. The other was attending his father's funeral during a bye week. The circumstances of those of the time away from the team is so different that those do not serve as proper comparators, nor is there any indication that Coach Kiffin didn't permit them back on the team, didn't sort of see them back in and sort of roll them back into team activities when the time was appropriate. As to the IIED claim, I just want to say first and foremost, the arguments that are made in this court and in this briefing have been forfeit. There was one paragraph of response, and you can find it at record 136, that basically was a recitation of the elements of the claim. And that's all that was presented to the district court. No argument, no case law was presented at that lower court. And so everything that you're getting is made in the first instance. Secondly, I'll just say in brief that Mississippi case law, and especially recent Mississippi cases, are very clear that liability does not extend to insults or indignities or even threats. So threatening to kick them off the team doesn't mean anything. There are cases, the Herbert case and the Riola case that are cited in our briefing, where cursing and obscene gestures or even comments about a person's ethnicity were not sufficient to create an IIED claim solely on the basis of words, speech alone. If there are no questions, I'll leave it at that. Thank you both. We'll hear from Mr. Rhodes. Yes, Your Honor, I will start at the last of their argument, the IIED claim. And we cited in our brief two earlier cases from Mississippi, and especially with the Lyons case, because that was the first case that was a similar case that recognized intended infliction of emotional distress. That person being thrown off the train and being cursed and whatever and having to walk miles in the dark, but that was not an IIED claim. No, Your Honor, but the language in that case, the court recognized that as being abusive and beyond the bounds of decency. But the court used that language for it. It just said the punitive damage would be permitted. And there really was very little, very brief, unlike what we write today, a very brief opinion, so it's hard to know even what the cause of action was. Do you have any more recent case law that would in any way dispute what's in the briefing by opposing counsel, that more is required than just profanity? Yes, Your Honor. Lyons case is one that's cited in our brief. And there is a more recent case in the Mississippi, by the Mississippi Court of Appeals, that found— Intermediate court. Intermediate court. As a matter of fact, the case was decided March 19th and they asked for a re-hearing. The re-hearing was just denied in August. And in that case, our IAED claim was allowed just for filing a lawsuit, not even the language being used. And the reason, and I give the site to that case, Your Honor, the reason that I keep referring back to those two other cases, that most recent Mississippi Supreme Court case is Weaver v. Ross, and I have the Westlaw site to it. It's 2024-WL-1169. If you want to inform us of new cases, we may get the numbers right down, but I want you to submit a post-argument letter with those citations in it. Yes, Your Honor. You can talk about the cases if you want to. In that case, Your Honor, Mississippi Court of Appeals held that standing for intentional inflection of emotional distress is whether the defendant's behavior is malicious, intentional, willful, wanton, or grossly. And the defendant's behavior in that case, they found on the counterclaim for intentional inflection of emotional distress was simply filing a lawsuit. The reason I go back to the Lyons case and the Alabama case, because in the Alabama case, the Mississippi Supreme Court held that because of the mode in which the passenger was ejected and because of the cursing and abusing on the part of the company, they thought it needed a ward of penalty damages. But they also held that the insulting and abusive language was above and beyond the pale of decency. In the Lyons case, the Mississippi Supreme Court talked about language that's considered offensive, and in that case, the Mississippi Supreme Court noted that, well, men became abusive and vulgar in their language toward Hermes Lyons and said, I know damn good and well you know where your son is. And he kept using that same curse words over and over and over. And that was a case that led to the formation of I.I.E.D. claims, where the Mississippi Supreme Court said that the use of that language, if it evokes a strong emotion of the unpleasant, that is something that is beyond. Yes, Your Honor. And the comparators are the two white football players. They were given time off. They asked for time off. And the thing of the comparator is And if you look at Mr. Robbins, declaration, he said they were given that time off. They were not denied or taken off any team activities. And he lists in his declaration mandatory team meetings. They were able to attend those, although they were given time off for different reasons. Daily defense meeting, football team meals, fall camps, daily team schedule, watch football games. He wasn't able to do any of that after he was kicked off. And the time frame with dealing with Coach Kiffin started in February. But the time frame dealing with his emotional distress really started in November of 2022. Would you clarify something for me? Mentioned in the briefing, it was mentioned in oral argument that fairly soon Mr. Robbins' counsel said no longer contact, told Kiffin and the school, I guess, no longer contact, go through the attorney. Were you the initial attorney? I was the initial attorney. And, Your Honor, dealing with that, Mr. Robbins had told them he was still serving and not to contact. Coach Kiffin ignored Mr. Robbins to contact him again. That's why that letter was written, because he was under doctor's care at that time. All right. Thanks to all three of you for your assistance on this case. We'll take it under advisement.